IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 5, 2010

## CALVIN OWENS v. STATE OF TENNESSEE

Direct Appeal from the Criminal Court for Shelby County
No. 01-06973-76    W. Otis Higgs, Jr.,  Judge

No. W2009-02298-CCA-R3-PC  - Filed February 1, 2011

The Petitioner, Calvin Owens, appeals from the Shelby County Criminal Court's denial of
post-conviction relief from his convictions for one count of attempted second degree murder,
one count of attempted especially aggravated robbery, and two counts of aggravated robbery.
On appeal, the Petitioner argues that trial counsel was ineffective in failing to communicate
with him, in failing to properly investigate his case, in withdrawing the suppression motion
regarding the photo spread identification, in questioning the victim regarding the bad dreams
he had while recovering from his injuries in the hospital, and in failing to advise him about
the advantages and disadvantages of testifying at trial.  In addition, the Petitioner argues that
appellate counsel was ineffective in failing to appeal a hearsay issue that was included in the
motion for new trial.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and
J. C. MCLIN, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the Defendant-Appellant, Calvin Owens.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant
Attorney General; William L. Gibbons, District Attorney General; and Nicole Germain,
Assistant District Attorney General, for the Appellee, State of Tennessee.

#### OPINION

**Factual Background.**  The underlying facts in this case were summarized by this
court on direct appeal:

On June 9, 2000, Reuben Ramirez went to a store with his friends, Jose Salazar and Manuel Ramirez, to cash their paychecks. They each left the store with several hundred dollars in cash. As they were driving in Mr. Salazar's car to the apartment complex in which they all lived, the hood of the car flew up, breaking the windshield. The men stopped the car, lowered the hood, and examined the damage to the car. They then proceeded to their apartment complex. When they arrived, the Defendant approached them, asking whether he could help. The Defendant told the men that he knew someone from whom the men could buy parts to repair the damaged car. The Defendant told them that he would get them a phone number they could call to buy parts for the car. As he was talking to the three men, the Defendant placed his hand on the hood of the car. The Defendant accompanied Jose Salazar and Manuel Ramirez into Mr. Salazar's apartment, and Reuben Ramirez went to get his car so they could drive it to the auto parts store. Mr. Salazar went into the bedroom of his apartment to look for a pen and paper. When he emerged from his bedroom into the living room of his apartment, he saw the Defendant pointing a gun at Manuel Ramirez's head. The Defendant told the two men to get on the floor, which they did. The Defendant took Mr. Salazar's wallet, which contained over seven hundred dollars. Manuel Ramirez told Mr. Salazar that the Defendant had taken his wallet as well.

As the Defendant attempted to leave the apartment, Reuben Ramirez arrived at the door. The Defendant put a gun to Reuben Ramirez's head, grabbed his hair, and threw him to the floor. The Defendant took Reuben Ramrez's wallet, then forced him into the bedroom where Mr. Salazar and Manuel Ramirez were. The Defendant demanded more money from Reuben Ramirez, so Reuben Ramirez reached into his pants pocket to get the money he had just received when he cashed his check. As Reuben Ramirez put his hand in his pocket, the Defendant shot him in the chest. The bullet passed through Reuben Ramirez's torso and exited his back. After the Defendant shot him, Reuben Ramirez fled out the window, ran to another apartment, and asked for help. A few minutes later, the police arrived. Reuben Ramirez testified that, as a result of the gunshot would to his chest, he could no longer work outside in the heat. During their testimony, both Reuben Ramirez and Jose Salazar identified the Defendant as the perpetrator.

Officer Ricky Davison, a crime scene investigator with the Memphis Police Department, examined the scene of the shooting. He located blood and a spent bullet on the bedroom floor of Mr. Salarzar's apartment. Officer Davison also dusted Mr. Salazar's entire car for fingerprints, and he was able

to obtain several from the hood of the car. Larry Preston, a fingerprint examiner with the Memphis Police Department, determined that one of the fingerprints lifted from the hood of Mr. Salazar's vehicle belonged to the Defendant.

Based on this evidence, the jury found the Defendant guilty of aggravated robbery with respect to Jose Salazar, aggravated robbery with respect to Manuel Ramirez, and, with respect to the attack on Reuben Ramirez, attempted especially aggravated robbery and attempted second degree murder.

State v. Calvin Owens, No. W2003-00033-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., at Jackson, Dec. 17, 2003), perm. to appeal denied (Tenn. May 10, 2004). The trial court sentenced the Petitioner as a Range I, standard offender to eleven years for each conviction. Id. at 1. The trial court merged the convictions for attempted second degree murder and attempted especially aggravated robbery and ordered that the two convictions for aggravated robbery be served consecutively to one another and consecutively to the merged convictions for an effective sentence of thirty-three years in the Tennessee Department of Correction. Id.

The Petitioner filed a pro se petition for post-conviction relief on July 15, 2004. Following the appointment of counsel, he filed an amended post-conviction petition on June 20, 2005. After appointed counsel withdrew and new counsel was appointed, the Petitioner filed three additional amended post-conviction petitions. Following an evidentiary hearing, the trial court entered an order denying post-conviction relief on October 9, 2009, and the Petitioner filed a timely notice of appeal.

**Post-Conviction Hearing.** At the March 23, 2009 post-conviction hearing, the Petitioner presented testimony from trial counsel and appellate counsel and testified in his own behalf. The State did not present any proof.

Trial counsel testified that he worked for the public defender's office and was appointed to represent the Petitioner in April 2001. He stated that it was difficult to investigate the Petitioner's case because all of the victims were Hispanic, and he "couldn't find anybody." He explained that one of the victims had returned to Mexico, and some of the other victims were difficult to locate. Trial counsel said that he asked his investigator to locate and interview the witnesses in this case.

Trial counsel stated that he informed the Petitioner that his fingerprints had been found on the victim's car. During the case, the only defense that the Petitioner asked him to pursue was an alibi defense. The Petitioner had given him the name of an alibi witness, the

Petitioner's father, who was located and interviewed. Trial counsel acknowledged that he did not call the Petitioner's father to testify at trial because the Petitioner's father "disclaimed [the document] purporting to be a signed affidavit of alibi." The Petitioner's father said that he did not sign the document and indicated that one of his brothers must have forged his signature.

Trial counsel stated that in addition to the charges in this case, the Petitioner had also been charged with aggravated rape and especially aggravated kidnapping in a separate case. He said that he informed the Petitioner of the potential sentences in both cases.

Regarding the instant case, trial counsel said that there was an issue regarding Jose Salazar's identification of the Petitioner in the photo spread because the photo spread "had been lost, apparently, nobody had it, [and it] couldn't be found." He added that no one was sure that Salazar was going to appear to testify at trial, especially since Salazar had not been cooperating with the State. Trial counsel said that he presented a motion to suppress Salazar's identification of the Petitioner to the court just prior to trial. However, he acknowledged that he withdrew this motion with the Petitioner's consent because he did not want Salazar to "go over the identification issue before trial . . . and have [his identification of the Petitioner] fresh on his mind." Trial counsel acknowledged that if he had not withdrawn the motion to suppress, he would have been able to question Salazar prior to trial. He said he spoke with the Petitioner twice before withdrawing the motion to suppress and that their conversations regarding the withdrawal of the motion were not "rushed".

Trial counsel stated that he provided the Petitioner with a copy of the discovery responses in this case, although he could not state the exact date that he provided this information. He also said that his investigator spoke to one of the victims through the victim's brother on the telephone; however, he and his investigator were unable to locate the two other witnesses. He acknowledged that his investigator did not speak Spanish.

Trial counsel stated that he asked Rueben Ramirez about the bad dreams that he had while recovering from his injuries in the hospital to establish that "perhaps [Ramirez's] recollection and identification [of the Petitioner] was clouded by all these personal problems that he had been relating." He also admitted asking Ramirez how long he had been hospitalized and that Ramirez had responded that he had been hospitalized for two years and nine days. When asked if he believed Ramirez's responses elicited sympathy from the jury, trial counsel responded, "Not necessarily. I mean [not] if there's another motive. And my motive in that case was to question his recollection"

Trial counsel stated that he was aware of the Petitioner's prior conviction for aggravated robbery. He recalled that the Petitioner was surprised when he learned that his

-4-

prior record was admissible if he testified at trial. He said that he did not tell the Petitioner not to testify because he typically did not recommend not testifying unless he was sure the State could not prevail on their case. However, he said that the Petitioner "was dead set on testifying." He added, "[even] if I had recommended that he not [testify], [the Petitioner] was going to testify." He said that Petitioner told him that he was not worried about this case but was only worried about his pending rape case.

When asked how many times he met with the Petitioner, trial counsel stated:

It's difficult to tell from here, because there [are] long gaps in time where [there are] no notes made. But, every time we came to Court, and I count, at least, six times, just in the ones that have been noted here, but I had to go back through and there were phone conferences and many letters back and forth. Quite a few times, I'd say.

Trial counsel said that he saw six notations in his file but believed that he had met with the Petitioner more than six times during the nine-month period between his appointment and the Petitioner's trial.

Trial counsel said that the Petitioner received an offer from the State of fifteen years in this case and rejected it. He confirmed that it was the Petitioner's decision to try the case. Trial counsel stated that he explained the risks of testifying to the Petitioner.

The Petitioner testified that he never spoke to trial counsel's investigator during the case. He said that he only spoke with trial counsel once or twice, other than at his court appearances. The Petitioner denied telling trial counsel that he was not concerned about the attempted second degree murder, attempted especially aggravated robbery, and aggravated robbery charges. He also said that he did not agree to withdraw the suppression motion regarding the photo spread identification. He claimed that trial counsel was aware that the photo spread had been lost but declined to inform him that it was missing. In addition, the Petitioner said that trial counsel never explained that his prior conviction for aggravated robbery would be presented to the jury if he chose to testify; however, he acknowledged that the trial court did inform him that his prior history was admissible during the Momon hearing prior to his testimony.

When asked about his defense strategy at trial, the Petitioner responded:

We didn't have a defense. My defense was the missing photo spread. I didn't even know I was picked out. But, [trial counsel] said that they [were] going to identify me, in trial, and that's all that mattered. I was trying to figure out

-5-

why he wasn't attacking, or even [challenging] the identification, the loss of [the photo spread][.]

The Petitioner said that his explanation for his fingerprints on the car was that he lived in the same neighborhood where the incident occurred, and he may have touched the car while he was chasing his young son. The Petitioner offered his father as an alibi witness, but his father "wasn't willing to come forth and just say plain out, concretely, that [the Petitioner] was working for him [at the time that the crimes occurred]." He also stated that he was working as a temporary employee at Williams Sonoma, but Williams Sonoma could not find his time card for the day that the incident occurred. Although he mentioned the possibility of his supervisor, Pamela Raper, testifying that he was working at Williams Sonoma when the offenses occurred, he said that trial counsel did not want to pursue Raper given the absence of his time card from Williams Sonoma.

The Petitioner acknowledged that trial counsel advised him that the victims would identify him at trial. He also acknowledged that trial counsel told him the trial court would likely impose consecutive sentences in the event that he was convicted of more than one offense. Finally, the Petitioner asserted that appellate counsel was ineffective in failing to present a hearsay issue on appeal that was included in the motion for new trial.

Appellate counsel testified that he had been specializing in appeals for the public defender's office since 1996 and had drafted approximately 300 appellate briefs. He stated that when he was assigned to represent the Petitioner in his appeal, he reviewed the trial transcript and motion for new trial prior to drafting the appellate brief. Appellate counsel said that four grounds were raised in the motion for new trial, which included two issues regarding sufficiency of evidence, one hearsay issue, and one issue regarding consecutive sentencing. He acknowledged that he raised all the issues except the hearsay issue because he "decided it wasn't a viable issue." When asked if there would have been any harm in raising the hearsay issue, appellate counsel responded:

> Well, you don't raise frivolous issues [because] for one thing it draws focus away from those issues you think may have some merit, and another it's just not the way a brief should be written. You should stick to issues that have at least some merit . . . .

He also stated that he did not believe that the Court of Criminal Appeals would have ruled in the Petitioner's favor on the hearsay issue had he raised it.

## ANALYSIS

In his appeal, the Petitioner argues that trial counsel was ineffective in failing to communicate with him, in failing to properly investigate his case, in withdrawing the motion to suppress the photo spread identification, in questioning the victim regarding his bad dreams while recovering from his injuries in the hospital, and in failing to advise him regarding the advantages and disadvantages of testifying at trial. In addition, the Petitioner argues that appellate counsel was ineffective in failing to raise a hearsay issue that was included in the motion for new trial on appeal. In response, the State argues that this court should affirm the denial of post-conviction relief because the Petitioner failed to prove his allegations of ineffective assistance of counsel by clear and convincing evidence. We agree with the State.

The Petitioner contends that he received ineffective assistance of counsel. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901, n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation

encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. The Tennessee Supreme Court has reiterated:

"Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (quoting Robinson v. United States, 448 F.2d 1255,1256 (8th Cir. 1971)).

**I.  Trial Counsel's Failure to Communicate.**  The Petitioner contends that trial counsel failed to properly communicate with him regarding his case.  Specifically, he claims that trial counsel did not talk to him an adequate number of times while his case was pending and failed to properly interview him and other witnesses related to the case.  The Petitioner also argues that trial counsel never communicated his range of punishment for the charged offenses prior to trial.

At the post-conviction hearing, trial counsel testified that he had documentation that he had met with the Petitioner at least six times, although he believed that he had met with him more than six times during the nine-month period between his appointment and the Petitioner's trial.  During his representation of the Petitioner, trial counsel provided the Petitioner with a copy of the discovery responses, informed him of the sentences ranges in this case and his pending rape case, and notified him of the State's offer of a fifteen-year sentence, which the Petitioner rejected.  Although trial counsel acknowledged that the victims in this case were difficult to locate, he stated that he was able to talk to one of the victims through the victim's brother on the telephone. He also pursued the Petitioner's father as a possible alibi witness, although the Petitioner's father ultimately disclaimed the document purporting to be an affidavit of alibi.  The record supports the post-conviction court's denial of relief on this issue.  The Petitioner has not established that trial counsel was deficient in failing to communicate or that he was prejudiced by trial counsel's actions.

**II.  Trial Counsel's Failure to Investigate.**  The Petitioner argues that trial counsel failed to appropriately investigate his case.  He first claims that trial counsel failed to properly investigate the case because the victims in the case were Hispanic and neither trial counsel nor the investigator spoke Spanish.  In addition, he contends that trial counsel was ineffective in failing to investigate the whereabouts of the victims in this case to determine whether they would appear at trial.  He asserts that if he had known that the victims would testify and identify him at trial, he would have accepted the State's offer of a fifteen-year sentence.

The record shows that trial counsel relayed the information regarding the victims in this case to his investigator and they attempted to interview the victims.  Trial counsel testified that his investigator was able to speak to one of the victims through the victim's brother on the telephone.  The record shows that another one of the victims left the country. With regard to another victim, Jose Salazar, the record shows that he was not cooperating with the State and that neither party was certain if he would appear at trial.  Finally, the Petitioner conceded during the post-conviction hearing that he knew that he had been positively identified from the discovery material. Under these circumstances, the petitioner has failed to prove deficient performance or prejudice as a result of counsel's conduct.  He is not entitled to relief on this issue.

The Petitioner also contends that trial counsel failed to investigate whether the Petitioner's manager could confirm that the Petitioner was working at the time of the incident in this case. He claims that the manager's testimony could have led to his exoneration. At the post-conviction hearing, trial counsel testified that the Petitioner "indicated that he might have been working [at Williams Sonoma], but [counsel] couldn't find anything there[.]" Moreover, this court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is the only way for the petitioner to establish:

(a)     a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case,

(b)     a known witness was not interviewed,

(c)     the failure to discover or interview a witness inured to his prejudice, or

(d)     the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id.

Despite the Petitioner's claim that trial counsel rendered ineffective assistance in failing to contact his manager regarding his alibi, the Petitioner failed to have his manager testify at the post-conviction hearing. See Black, 794 S.W.2d at 757. Accordingly, the Petitioner has failed to prove that trial counsel's performance was deficient or that he was prejudiced as a result. He is not entitled to relief on this issue.

**III. Trial Counsel's Withdrawal of the Motion to Suppress the Photo Spread Identification.** The Petitioner argues that trial counsel was ineffective in withdrawing the suppression motion regarding the photo spread identification. He notes that the photo spread identification was lost, and Salazar failed to appear at the preliminary hearing. He claims that by withdrawing this motion, trial counsel was unable to cross-examine Salazar in order to evaluate the strength of the State's case and was unable to advise the Petitioner that Salazar would, in fact, be able to identify him at trial. He further asserts that trial counsel's actions prevented him from accepting the State's offer of a fifteen-year sentence.

The record shows that trial counsel withdrew the motion to suppress after having two separate conversations with the Petitioner. Trial counsel explained that he withdrew the suppression motion with the Petitioner's consent because he did not want Salazar to have his identification of the Petitioner fresh on his mind immediately prior to trial. We will not

second-guess trial counsel's strategy regarding the withdrawal of the suppression motion. See Burns, 6 S.W.3d at 462; Strickland, 466 U.S. at 688-89. The Petitioner has failed to establish that trial counsel's withdrawal of the suppression motion was deficient or that he was prejudiced as a result of counsel's conduct.

**IV. Trial Counsel's Questioning of the Victim Regarding the Bad Dreams He Had While in the Hospital Recovering from his Injuries.** The Petitioner notes that one of the victims, Reuben Ramirez, was shot during the incident and was hospitalized for a lengthy period of time. At trial, trial counsel asked this victim about the bad dreams he had while hospitalized. The Petitioner argues that although trial counsel claimed that he asked these questions to prove that the victim did not clearly remember the incident because of his medications, the victim's responses to these questions made the jury more sympathetic towards the victim. This line of questioning "falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). Trial counsel testified that he asked Ramirez these questions to challenge his recollection of the incident and his identification of the Petitioner. The Petitioner has failed to establish that trial counsel was deficient or any prejudice as a result of this line of questioning.

**V. Trial Counsel's Failure to Advise the Petitioner of the Advantages and Disadvantages of Testifying at Trial.** The Petitioner contends that trial counsel failed to advise him about whether he should testify prior to trial. Specifically, he claims that trial counsel did not inform him that his criminal history could be used against him if he chose to testify. He further claims that trial counsel did not "discuss his testimony or his right to testify until the time he was supposed to testify."

At the post-conviction hearing, trial counsel testified that he advised the Petitioner regarding the risks of testifying. Trial counsel stated, however, that it was ultimately the Petitioner's decision to make. He further stated that he was aware of the Petitioner's prior conviction for aggravated robbery and recalled the Petitioner's surprise when he learned that his prior conviction would be admitted if he chose to testify. More importantly, the Petitioner acknowledged that the trial court, at the Momon[1] hearing, informed him that his prior conviction would be admissible if he chose to testify. Under these circumstances, the Petitioner has failed to establish deficient performance or prejudice as a result of trial counsel's performance. He is not entitled to relief on this issue.

**VI. Appellate Counsel's Failure to Include an Issue from the Motion for New Trial in the Petitioner's Appeal.** The Petitioner also argues that appellate counsel was ineffective in failing to appeal the issue regarding hearsay, which was listed in the motion

---

[1] Momon v. State, 18 S.W.3d 152 (Tenn.1999).

for new trial. He claims that if appellate counsel had raised this issue, the outcome of his appeal would have been different.

Appellate counsel testified that he deliberately did not raise the hearsay issue because he did not believe that it was a "viable issue." He added that he refrained from raising this issue because it would have drawn attention away from the other potentially meritorious issues. Moreover, appellate counsel stated that he did not believe that the Court of Criminal Appeals would have ruled in the Petitioner's favor on this issue had he raised it. After reviewing the record, we agree with appellate counsel's assessment regarding the viability of this issue. Accordingly, the Petitioner has failed to show that appellate counsel was deficient in failing to raise the hearsay issue on appeal.

## CONCLUSION

**Conclusion.**   Upon review, we affirm the judgment of the post-conviction court.

_____

CAMILLE R. McMULLEN, JUDGE